KEVIN VERTEFEUILLE,            :
                                  :
          PLAINTIFF,        :
                                  :           PRISONER CASE NO.
      v.                    :           3:07-cv-323 (JCH)
                                  :
AMY HOUDE,                 :           SEPTEMBER 22, 2008
                                  :
          DEFENDANT.      :

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 28]

Plaintiff Kevin Vertefeuille ("Vertefeuille"), currently confined at the Garner Correctional Institution ("Garner") in Newtown, Connecticut, commenced this civil rights action *pro se* pursuant to 28 U.S.C. § 1915. Vertefeuille alleges that defendant Amy Houde ("Houde") improperly determined that he could be held accountable for disciplinary violations. Defendant Houde has filed a motion for summary judgment. For the reasons that follow, the defendant's motion is granted.

## I.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The moving party may satisfy this burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101,

105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted).

The court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." <u>Holcomb v. Iona College</u>, 521 F.3d 130, 137 (2d Cir. 2008) (citing <u>Anderson</u>, 477 U.S. at 255). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks and citations omitted).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. <u>See Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. <u>Carey v. Crescenzi</u>, 923 F.2d 18, 21 (2d Cir. 1991).

II.   FACTS[1]

Vertefeuille has a long history of behavioral problems.  Defendant's Local Rule

56(a)(1) Statement ("Def.'s L.R. 56(a)1 Stat."), ¶¶ 4-5.  Initially hospitalized at age three,

Vertefeuille has been readmitted to inpatient psychiatric facilities sixteen times,

spending about ten years of his childhood in these facilities.  Id. ¶ 9.  During several

periods of incarceration since 1995, Vertefeuille has been treated by mental health

professionals employed by the Department of Correction and University of Connecticut

Health Center Correctional Managed Health Care.  Id. ¶ 10.  Vertefeuille has been

diagnosed with several mental illnesses including bipolar disorder, impulse control

disorder, antisocial personality disorder, and attention deficit hyperactivity disorder.  Id.

Bipolar disorder involves long-term dramatic mood changes.  High or manic

episodes lasting several weeks alternate with periods of depression lasting several

months.  Daily or weekly mood fluctuations generally are not indicative of bipolar

---

[1] The facts are taken from Defendant's Local Rule 56(a)1 Statement (Doc. No. 28-4) and attached affidavits.  Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement, which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party.  Each admission or denial must include a citation to an affidavit or other admissible evidence.  In addition, the opposing party must submit a list of disputed factual issues.  See D. Conn. L. Civ. R. 56(a)2 & 56(a)3.  With her Motion for Summary Judgment, Houde filed a Notice to Pro Se Litigant [Doc. No. 29] informing Vertefeuille of his obligation to respond to the motion for summary judgment and of the contents of a proper response.

Although Vertefeuille filed a document entitled "Plaintiff's local rule 56(a)(1) Statement," the document mainly consists of argument and disagreement with statements made by defendant.  Vertefeuille has not provided the required citations to evidence of record or attached evidence supporting his statements.  Accordingly, the defendant's facts are deemed admitted.  See D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").  Despite Vertefeuille's failure to comply with court rules, the court has considered his argument and referenced documents in opposition to the motion for summary judgment.

disorder. Rapid fluctuations suggest problems with impulse control or antisocial personality disorder. Id. ¶¶ 11, 187. Psychotherapy and medications, such as antidepressants, mood stabilizers, antipsychotics, and benzodiazepines, are effective in treating bipolar disorder. Id. ¶ 12.

Impulse control disorder is characterized by difficulty resisting the urge to do something destructive to self, others or property. While they may not plan their actions, persons suffering from impulse control disorder are fulfilling their immediate conscious wishes. Id. ¶ 13. While antidepressants and mood stabilizers have been successful in treating impulse control disorder, there is evidence that maximum treatment response is obtained when medication is combined with cognitive-behavioral therapy which encourages patients to take responsibility for their actions. Id. ¶ 14.

Antisocial personality disorder is characterized by disregard for and violation of others' rights. The disorder begins before the age of fifteen and extends into adulthood. Id. ¶ 16. A person suffering from antisocial personality disorder is impulsive, deceitful, irritable, aggressive, and irresponsible. He shows no remorse for his actions, recklessly disregards his safety and the safety of others, fails to conform to social behavioral norms, and has an extreme sense of entitlement. Id. ¶¶ 17, 19. Medication and intensive psychoanalysis have not been reported effective in treating antisocial personality disorder. The condition is treated by reinforcing appropriate behavior and teaching the patient to accept the consequences of his behavior. Id. ¶¶ 21-23.

Persons suffering from psychosis are not in touch with reality, do not think through their actions, and rarely can logically explain their actions. Vertefeuille, on the

other hand, explains his destructive behavior as reactions to his negative interpretation of conditions of confinement or actions of correctional staff. Id. ¶ 190. This suggests that his actions are attributable to a personality disorder rather than bipolar disorder. Self-mutilation is not a symptom of bipolar disorder. It is, however, a common feature of personality disorders such as antisocial personality disorder. Id. ¶ 191.

Effective September 2004, the Department of Correction revised the Code of Penal Discipline to preclude issuance of a disciplinary report to an inmate housed in a unit for treatment of the mentally ill if the behavior resulting in the disciplinary report was the result of the inmate's mental illness and issuance of the report would further aggravate the mental illness.[2] Between July 2005 and October 2007, the time period encompassed by this action, defendant Houde was the person at Garner who determined whether mentally ill inmates should receive disciplinary reports pursuant to this administrative directive. Houde. Aff. ¶ 3.

Vertefeuille engaged in self-destructive behavior and received several

---

[2]Prior to January 1, 2008, the approved language of the directive required that the disciplinary report be dismissed only if the conduct was the result of the inmate's mental illness and the resulting discipline would aggravate the inmate's mental illness. Compl. Ex. C.

Administrative Directive 9.5, the Department of Correction Code of Penal Discipline, now provides: "Before a class A disciplinary report is delivered to an inmate housed in a designated housing area for the mentally ill or inmates awaiting transfer to such a designated housing area, a qualified mental health professional shall be consulted and asked to express an opinion as to:
1. whether the behavior for which the disciplinary report is given is the result of the inmate's mental illness; and
2. whether disciplining the inmate would aggravate the inmate's mental illness.
. . . . If the qualified mental health professional answers in the affirmative to either questions (1) or (2) above, the disciplinary report shall not be delivered to the inmate and shall be dismissed, unless the Unit Administrator directs in writing otherwise." Dep't of Correction Admin. Dir. 9.5, § 10.I (effective Jan. 1, 2008), http://www.ct.gov/doc (last visited Aug. 26, 2008).

disciplinary reports while he was confined at Garner.  On August 13, 2005, he banged

his head on the cell window causing a laceration for which he received sutures at the

University of Connecticut Health Center.  Vertefeuille did not display any sign of

psychosis and was not illogical or disorganized.  Rather, he informed staff that his

housing unit was "out of control" and he wanted to get out of the unit.  Def.'s L.R. 56(a)1

Stat. ¶ 25.  Upon his return from the hospital, Vertefeuille was admitted to the inpatient

mental health unit ("IPM").  The treating psychiatrist observed that Vertefeuille was in

good spirits and joking.  He displayed good control and told the psychiatrist that he was

unhappy because the housing unit had lost privileges.  Id. ¶ 26.

Three days later, the psychiatrist noted that Vertefeuille was animated,

pressured, laughing, and demanding.  He focused on legal issues and displayed some

grandiosity.  The psychiatrist concluded that there was no evidence of psychosis or

depression and that Vertefeuille was not a danger to himself or others, despite being

highly impulsive.  Vertefeuille was discharged from IPM.  Id. ¶ 29.  Later that morning,

Vertefeuille covered his cell window and ripped his mattress to shreds because he

could not sleep on it.  Id. ¶ 30.

On August 25, 2005, Vertefeuille told a psychiatrist that he injured himself to

punish a correctional officer who would not let him have coffee.  The psychiatrist noted

that Vertefeuille was refusing his medication.  Although Vertefeuille did not meet the

criteria for involuntary medication, he did receive one dose of medication to control

impulsivity.  Id. ¶ 31.

On September 28, 2005, Vertefeuille banged his head on the cell door until he

caused a laceration. He was taken to Danbury Hospital for sutures. A social worker determined that Vertefeuille could participate in the disciplinary process and that receipt of a disciplinary report would not aggravate his mental illness. Vertefeuille received a disciplinary report for self-mutilation, which was dismissed, and for flagrant disobedience, on which he was found not guilty. Id. ¶ 32.

At various times, Vertefeuille has told mental health staff that he bangs his head because he is unhappy with the response by correctional staff to his demands. For example, on September 29, 2005, he told a social worker that, "if they just gave me what I wanted, I wouldn't be here." The next day, he threatened to re-injure himself "if he didn't get his meal trays." He also admitted destroying state property when staff does not respond as quickly as he wants. Vertefeuille was pleased to report on October 11, 2005, that correctional staff "moves[] now when he wants something." Id. ¶¶ 33, 34, 37, 40, 44, 50.

In October 2005, Vertefeuille banged his head twice in one week. He was admitted to IPM and treated with medication. Although plaintiff has a history of refusing his medication or flushing it down the toilet, he took his medication at this time and stated that he would not hurt himself. Id. ¶¶ 45-49. A few days after he was returned to his housing unit, however, he was returned to IPM for noncompliance with medication. Id. ¶ 52.

On December 20, 2005, a power problem caused Vertefeuille's housing unit to be locked down. Vertefeuille reacted by ripping his mattress and banging his head. Although staff attributed his actions to a desire to leave the housing unit, they

transferred Vertefeuille to IPM where he was seen and evaluated by a psychiatrist.

Vertefeuille threatened self harm if he was transferred out of IPM before going to

recreation. Shortly after, a nurse reported that he was laughing and joking with her.

The following day, while speaking to the psychiatrist, Vertefeuille demanded that he not

be returned to his housing unit. Several days later, he told the psychiatrist that the

lockdown was over, and he wanted to return to his housing unit. Id. ¶¶ 61-64, 68, 72.

A few days after his return to the housing unit, Vertefeuille told staff that he

wanted to leave the housing unit because his demands were not being met. The

following day, he ripped his mattress. Mental health staff examined Vertefeuille and

determined that he was angry and had poor judgment, but displayed no signs of

disorganized thinking, psychosis, or memory impairment. Vertefeuille received a

disciplinary report for destruction of property and was found guilty. Id. ¶¶ 73-74.

The following week, Vertefeuille placed his hand outside of the food trap and

complained that the noise in the unit had woken him up. He complied with verbal

commands to withdraw his arm. Soon after, he began flooding his cell. In response,

the water was turned off. Vertefeuille then began banging his head on the cell wall. Id.

¶ 75. He was admitted to IPM as a result of the self-inflicted injuries. Vertefeuille told

the psychiatrist that he could no longer endure correctional staff waking him up every

fifteen minutes. The psychiatrist noted that Vertefeuille was alert and oriented with no

suicidal or homicidal ideation or visual or auditory hallucinations. However, his insight

was poor, his judgment was impaired, he was demanding, and he was acting entitled.

Vertefeuille refused to consider taking psychotropic medications. Mental health staff

determined that Vertefeuille was able to participate in the disciplinary process and receipt of the disciplinary report would not aggravate his mental illness. Id. ¶¶ 76, 78.

On January 12, 2006, Vertefeuille told a nurse that he would continue banging his head until he died. Then, his mother could sue and become a millionaire. A few days later, he told mental health staff that he intended to sue because he had not been evaluated and involuntarily medicated. He admitted needing medication to treat his mental illness, but said that he would refuse to take medication until he was forced. The following week, he told the psychiatrist that he would sue if the psychiatrist attempted to seek involuntary medication. Id. ¶¶ 79-80, 83.

On February 3, 2006, Vertefeuille began banging on his door while correctional staff was trying to restrain another inmate. He refused multiple orders to stop. Vertefeuille refused to comply with an order to place his hands through the food trap to be handcuffed and began hitting his head against the wall. Vertefeuille was taken to the hospital for sutures. Upon his return to Garner, Vertefeuille refused to submit to medical checks and threw his milk and food tray against the wall. After evaluation, a mental health worker determined that Vertefeuille could participate in the disciplinary process and that receipt of the disciplinary report would not aggravate his mental illness. Vertefeuille was found guilty of flagrant disobedience. Id. ¶¶ 85-87.

The following day, Vertefeuille refused to submit to neurological checks and again threw his milk against the cell wall. Later in the day, he tore his ferguson gown. He stated that he tore it because the Velcro fasteners did not work and he needed a new gown. Mental health staff determined that Vertefeuille could participate in the

disciplinary process after his release from IPM and that receiving the disciplinary report would not aggravate his mental illness. Vertefeuille was found guilty of destruction of property. Id. ¶¶ 88-89.

On February 5, 2006, Vertefeuille was sent to the University of Connecticut Health Center because he banged his head and reopened the sutures he had received two days earlier. Vertefeuille was angry that his dinner tray had fallen on the floor. The disciplinary charge of interfering with safety and security was dismissed when a mental health worker determined that Vertefeuille was unable to participate in the disciplinary process and that delivery of the disciplinary report would aggravate his mental illness. Vertefeuille told a nurse that he had banged his head again because correctional staff interfered with his food tray. Id. ¶¶ 90-92, 95.

On August 5, 2006, Vertefeuille covered his window and began flooding his cell. He used profanity and threats toward correctional staff and made threatening hand gestures. Psychiatric examination showed that Vertefeuille was alert and oriented with no auditory hallucinations. Mental health staff approved Vertefeuille to receive a disciplinary report for interfering with safety and security and be transferred to restrictive housing. Vertefeuille was found guilty of one charge. Id. ¶¶ 108-09.

On October 4, 2006, Vertefeuille threw his chair against the cell door several times, breaking the chair into several pieces. He told the disciplinary investigator that he was not guilty because he had a right to break the chair. Mental health evaluation showed no "prominent Mental Health issues," only an irritated mood and affect. Vertefeuille displayed clear thought processes. He was organized and goal-oriented

with no evidence of cognitive or functional impairments, psychosis, or delusions. Vertefeuille received a disciplinary report for destruction of property and was found guilty. Id. ¶¶ 111-14.

On November 17, 2006, Vertefeuille threatened a correctional counselor when she did not immediately provide him copies. He entered his cell when ordered to do so, but then ripped two mattresses. The mental health examination showed that Vertefeuille was verbally coherent and alert. Although he was angry and loud, Vertefeuille could sit and answer questions. The social worker noted that Vertefeuille had poor impulse control when he thought his needs were not being met. He could not tolerate any delay in obtaining legal copies and wanted to go to IPM where, he believed, his needs would be met more quickly. The social worker determined that Vertefeuille was able to participate in the disciplinary process and that the actions resulting in the disciplinary reports were not the result of Vertefeuille's mental illness. He approved issuance of the disciplinary report for threats and destruction of property and Vertefeuille's transfer to restrictive housing. Vertefeuille pleaded guilty to both charges. Id. ¶¶ 118-123.

On January 12, 2007, Vertefeuille broke the glass in his cell door with a plastic chair and ripped his mattress. He stated that the correctional counselor did not comply with his demands in a timely manner. He was tired of waiting for the correctional counselor to comply and wanted a change of housing unit. The social worker evaluated Vertefeuille and found him verbal, coherent, alert, calm, and cooperative. Vertefeuille had clear thought processes, was not agitated, and maintained eye contact. The social

worker determined that Vertefeuille could participate in the disciplinary process. Vertefeuille was found guilty of destruction of property valued at $100 or more.  Id. ¶¶ 131-34.

On March 8, 2007, Vertefeuille was irritated when he returned from court.  He again broke the glass in his cell window with a chair.  When he was ordered to lie down on the ground, he did not comply and reached for the broken glass.  When correctional staff sprayed one burst of cap-stun, Vertefeuille complied with the order.  Vertefeuille told correctional staff that he could not remember why he broke the glass.  Vertefeuille was examined by a social worker who found him alert with no signs of psychosis. Vertefeuille denied suicidal or homicidal ideation and auditory or visual hallucinations. The social worker determined that Vertefeuille could participate in the disciplinary process and be placed in restrictive housing.  Id. ¶¶ 144-46.

On April 2, 2007, Vertefeuille was involved in an argument with another inmate that escalated into an altercation.  Vertefeuille received a disciplinary report for interfering with safety and security, threats, and fighting, and was cleared for placement in restrictive housing.  Id. ¶¶ 153-54.  Shortly after his arrival in a restrictive housing overflow area, Vertefeuille began ripping his sheet and stuffing the pieces into the toilet. He then repeatedly flushed the toilet causing the water to overflow and flood the cell and corridor.  Vertefeuille was transferred to another cell and restrained with handcuffs and leg irons connected by a tether chain.  He told correctional staff that they would release him from the restraints within a half hour.  Soon after, Vertefeuille began banging his head against the cell door and smearing blood from the resulting wound on

the door.  The on-call psychiatrist ordered Vertefeuille transferred to IPM and placed in full stationary therapeutic restraints.  Vertefeuille refused medical treatment and threatened to kill the doctor.  He received a disciplinary report for threats and was evaluated by a nurse clinician.  She found that his thoughts were clear and logical and he was alert and coherent.  Concluding that the threats were a behavioral issue, she determined that he could participate in the disciplinary process and that receiving the disciplinary report would not aggravate his mental illness.  Id. ¶¶ 157-61.

A few minutes later, Vertefeuille was evaluated by a psychiatrist.  Vertefeuille told the psychiatrist that he hit his head because he wanted to make the staff work harder.  Regarding the threat, he said that he would not waste his time on any of the staff.  The psychiatrist concluded that Vertefeuille's antisocial personality disorder was prominent.  When Vertefeuille stated that he would not harm himself, the psychiatrist ordered the restraints be removed, but that staff continue one-to-one monitoring. Vertefeuille napped for an hour and then participated in the leisure skills group.  Id. ¶¶ 162-68.

III.    DISCUSSION

Vertefeuille asserts one claim in this action.  He argues that, by holding him accountable for his actions, defendant was deliberately indifferent to his serious mental health needs.  Defendant argues that Vertefeuille cannot show that approving the issuance of disciplinary reports rises to the level of a constitutional violation.

Deliberate indifference by prison officials to a prisoner's serious medical or mental health need constitutes cruel and unusual punishment in violation of the Eighth

Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To prevail on such a claim,

Vertefeuille must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference" to his serious medical need.  Id. at 106.  He must show intent to either

deny or unreasonably delay access to needed medical care or the wanton infliction of

unnecessary pain by prison personnel.  Id. at 104-05.

Mere negligence will not support a section 1983 claim; "the Eighth Amendment is

not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law .

. . ."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in

prison medical care will rise to the level of a constitutional violation."  Id.  Rather, the

conduct complained of must "shock the conscience" or constitute a "barbarous act."

Torres v. Trombly, 421 F. Supp. 2d 527, 531 (D. Conn. 2006) (citations omitted).  An

inmate does not have a constitutional right to the treatment of his choice.  Dean v.

Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Mere disagreement with prison officials

about what constitutes appropriate care does not state a claim cognizable under the

Eighth Amendment.  "So long as the treatment given is adequate, the fact that a

prisoner might prefer a different treatment does not give rise to an Eighth Amendment

violation."  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate

indifference standard.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The

alleged deprivation must be "sufficiently serious" in objective terms.  Wilson v. Seiter,

501 U.S. 294, 298 (1991).  "[A] condition of urgency, one that may produce death,

degeneration, or extreme pain" must exist.  Johnson v. Wright, 412 F.3d 398, 403 (2d

Cir. 2005) (citations omitted). The objective component splits further into two inquiries. The first is "whether the prisoner was actually deprived of adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006). The second is "whether the inadequacy in medical care is sufficiently serious," including what harm, if any, it "has caused or will likely cause.' Id. For the subjective component, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. Id.

Vertefeuille has been diagnosed with impulse control disorder, antisocial personality disorder, bipolar disorder, and attention deficit hyperactivity disorder. Defendant does not contest that these are serious mental health needs. Thus, for purposes of this ruling, the court assumes that Vertefeuille has a serious mental health need and addresses only whether Houde's actions actually deprived Vertefeuille of adequate care, and if so, whether Houde acted with a sufficiently culpable state of mind.

Vertefeuille challenges the determinations of mental health staff that he could be held accountable for his actions and that receipt of disciplinary reports would not exacerbate his mental illness. The determinations were based on the opinion that Vertefeuille's actions were the result of impulse control disorder and antisocial personality disorder, both of which are treated by encouraging an individual to accept responsibility for his actions. Medical judgment usually is not sufficient to support an Eighth Amendment violation. See Hernandez v. Keane, 341 F.3d 137, 146-47 (2d Cir. 2003) (summary judgment appropriate where deliberate indifference claim relied on

delay in providing risky treatment).

Vertefeuille argues that he cycles through episodes of mania and depression in the same day and points to a diagnosis of Bipolar I Disorder. Compl. Ex. A-7. A person suffering from Bipolar I Disorder has had at least one manic or mixed episode (of mania and depression) during his lifetime. <u>Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR</u> 382 (4th ed. 2000). The episodes of mania and depression often are separated by periods where the person lives a normal life. Vertefeuille has presented no medical evidence that he experienced cycling periods of mania and depression at times relevant to this action. The medical note he relies upon, Compl. Ex. B-6, references a historic diagnosis of mixed episodes of mania and depression. Vertefeuille also states that Dr. Ducate noted that a nurse indicated that he suffers from bipolar disorder. Ducate Aff., Doc. No. 28-5, ¶ 123. In March 2007, Vertefeuille received an assessment of bipolar disorder, impulse control disorder, cocaine dependence, and borderline personality disorder. <u>Id.</u> Defendant does not contest the fact that Vertefeuille has been diagnosed with bipolar disorder. Instead, she has presented medical opinion evidence that the behaviors for which Vertefeuille received disciplinary reports were caused by his antisocial personality disorder and impulse control disorder, not bipolar disorder. Id. ¶ 147. Vertefeuille has presented no contradictory evidence. Absent such evidence, and any reason to question the record before the court, the medical judgment is valid and the disagreement is not cognizable under section 1983.

Vertefeuille acknowledges the difference of opinion over the cause of his actions:

16

he believes that his actions are the result of bipolar disorder while defendant attributes the actions to his impulse control disorder and antisocial personality disorder.  He argues that, as the nonmoving party, he is entitled to a favorable inference and denial of the motion for summary judgment.

There is no dispute that Vertefeuille has been diagnosed with bipolar disorder, impulse control disorder, and antisocial personality disorder.  The issue is whether his actions are a symptom of bipolar disorder.  Defendant has presented medical opinion evidence that Vertefeuille's actions are not the result of bipolar disorder.  Vertefeuille has presented no contrary evidence.  His own unsupported lay opinion cannot overcome a properly supported motion for summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

In addition, the cases Vertefeuille cites do not support his position.  For example, in Eng v. Smith, 849 F.2d 80 (2d Cir. 1988), the Second Circuit approved issuance of a preliminary injunction to address systemic deficiencies in mental health care in a New York prison.  Vertefeuille, however, does not allege that the mental health care system at Garner is deficient in toto.  He only challenges the determination that he should be held accountable for his actions.  In Arnold ex rel. H.B. v. Lewis, 803 F. Supp. 246 (D. Ariz. 1992), the court enjoined prison officials from punishing an inmate for exhibiting symptoms of her mental illness after finding that correctional officials failed to treat the inmate's mental illness, repeatedly confined her in restrictive housing for periods of six months at a time, and failed to evaluate whether this punishment would exacerbate her illness.  Id. at 249-50, 254-55.  In contrast, defendant has presented evidence that

Vertefeuille has received mental health treatment continuously while incarcerated and has not been disciplined unless mental health staff first determined that his illness would not be exacerbated.

Having found that Vertefeuille was not actually deprived of adequate medical care, the court need not reach the question of whether Houde acted with a culpable state of mind. The court concludes that Vertefeuille fails to meet his burden of presenting evidence demonstrating a genuine issue of material fact on his claim of deliberate indifference to a serious medical need. Thus, defendant's Motion for Summary Judgment is granted.

IV.    CONCLUSION

Defendant's Motion for Summary Judgment [**Doc. No. 28**] is **GRANTED**. The Clerk is directed to enter judgment and close this case.

**SO ORDERED** this 22nd day of September 2008, at Bridgeport, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge